**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

9 KINGS HONG KONG LIMITED,

     *Plaintiff,*

v.

BEYOND MASKS, LLC,
SCHIMEON A. FREDERICK, JR., and
JASON MAY,

     *Defendants.*

Civil Action No. _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff 9 Kings Hong Kong Limited ("Plaintiff," "9 Kings," or the "Buyer"), by and through its undersigned counsel, for its complaint against Beyond Masks, LLC ("Beyond Masks" or the "Seller"), Schimeon A. Frederick, Jr. ("Mr. Frederick"), and Jason May ("Mr. May" and collectively with Beyond Masks and Mr. Frederick, "Defendants") hereby alleges as follows:

## NATURE OF ACTION

1.    This action arises under New York common law and New York's Uniform Commercial Code ("UCC"), as it involves breach of contract for the sale of goods (here, a specific brand of medical-grade nitrile gloves) and fraud on behalf of the Defendants relating to that contract.

2.    9 Kings is engaged in the business of procuring the manufacture of products for clients through third-party manufacturers located in China and elsewhere with whom it has developed relationships.

3.    On information and belief, Beyond Masks is engaged in business as a supplier and distributor of personal protective equipment, including medical-grade gloves.  Beyond Masks'

17382930.1

website states that it has created "a team of highly experienced, top-notch partners to fortify sourcing, international production and connecting products with end users" to create "a solution to the desperate cry" for personal protective equipment in the wake of the COVID-19 pandemic.[1] Beyond Masks is therefore a merchant engaged in the sale of goods within the meaning of UCC §§ 2-104 and 105.

## PARTIES

4.     Plaintiff 9 Kings is a Hong Kong corporation with a principal office located at Unit F, 14/F, Golden Sun Centre, 59-67 Bonham Strand West, Sheung Wan, Hong Kong.

5.     With respect to the transaction and related events at issue in this suit, 9 Kings was represented by its CEO, Mr. Nicholas Matfus.

6.     On information and belief, Beyond Masks is a Florida limited liability company with a principal place of business at 101 Plaza Real South, Suite 203, Boca Raton, FL 33432.

7.     On information and belief, Schimeon A. Frederick, Jr. is a citizen and resident of Florida, and the Registered Agent and Manager of Beyond Masks.  As described more fully below, Mr. Frederick executed certain documents on behalf of Beyond Masks and made certain fraudulent representations with respect to the transaction and related events at issue in this suit.

8.     On information and belief, Jason May is a citizen and resident of Florida, and is an agent of Beyond Masks.  As described more fully below, Mr. May executed certain documents on behalf of Beyond Masks and made certain fraudulent representations with respect to the transaction and related events at issue in this suit.

---

[1] About - Beyond Masks, https://www.beyondmasks.com/about/ (last accessed April 12, 2021).

17382930.1

## JURISDICTION AND VENUE

9.      This Court has diversity subject matter jurisdiction and supplemental subject matter

jurisdiction over the claims in this suit pursuant to 28 U.S.C. §§ 1332(a)(2) and 1367.  Plaintiff is

a foreign corporation, Defendants are a United States limited liability company and citizens of the

United States, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10.     This court has personal jurisdiction over all parties to this action, and venue is

appropriate in this District, pursuant to the forum selection clause contained in the parties' Sale

and Purchase Agreement (the "SPA"), which provides:

> This Agreement shall be governed by, and shall be construed,
> interpreted and enforced in all respects in accordance with, the
> internal laws of the State of New York, without regard for its choice
> of law or conflicts of laws provisions.  **Each Party hereby
> irrevocably consents to the personal and exclusive jurisdiction
> of the Federal and State courts located in Manhattan, New York
> in each case in connection with any action or proceeding arising
> out of or relating to this Agreement, and agrees that venue shall
> be proper in such courts to the exclusion of the courts in any
> other state or country**, and that any final judgment entered by any
> such court shall be fully enforceable in any other court in any
> jurisdiction.  **The Parties further irrevocably agree that such
> designated forum is proper and convenient, irrevocably waive
> any objection to venue in such courts, and hereby irrevocably
> submit to the personal jurisdiction of such courts**.

SPA § 11(a) (emphases added), attached as Exhibit A hereto.[2]

---

[2] Exhibit A is a copy of the as-executed SPA, which, due to a technical error, rendered page 4 of
the SPA in a difficult-to-read format.  Exhibit B hereto contains a verbatim reproduction of page
4 of the SPA in an easier-to-read format.

17382930.1

## FACTS

**Beyond Masks Induces 9 Kings To Contract To Buy Goods Beyond Masks Did Not Have**

11.     In January of 2021, 9 Kings and Beyond Masks engaged in discussions regarding the purchase by 9 Kings from Beyond Masks of personal protective equipment consisting of 430,000 boxes of Supérieur brand medical-grade nitrile examination gloves (the "Gloves").

12.     On or about January 27, 2021, Mr. May executed a Mutual Non-Circumvention and Confidentiality Agreement with 9 Kings on behalf of Beyond Masks as its "duly authorized" representative to protect any potentially sensitive information that 9 Kings and Beyond Masks may exchange with respect to the purchase and sale of the Gloves.

13.     On or about January 28, 2021, Beyond Masks indicated to 9 Kings that the Gloves were on the ground in a warehouse in Los Angeles, California, and that the Gloves would be available for inspection the following day (a Friday) by 9 Kings and its designees at the Los Angeles warehouse.  On or about January 28, 2021, Mr. May advised Chris Held ("Mr. Held"), who represented 9 Kings, that a shipment of about 300,000 boxes of Gloves was being unloaded that day and that an additional 130,000 boxes of Gloves were already on location.  Mr. May further stated that the 300,000 boxes were "available but not secured until deposit" from 9 Kings.

14.     On information and belief, these representations were false when made, and Beyond Masks and Mr. May knew that they were false and that the Gloves were not in a warehouse in Los Angeles.

15.     In reliance on the representations that the Gloves existed and were in the Los Angeles warehouse awaiting inspection, 9 Kings sent its inspector, Mr. Held, to Los Angeles to be available for the on-site inspection.

17382930.1

16.     On or about January 28, 2021, later in the day after telling 9 Kings that the Gloves would be ready for inspection, Beyond Masks notified 9 Kings that the Gloves would not be available for inspection on January 29, 2021, but would instead be available for inspection on Monday, February 1, 2021.

17.     On information and belief, the representation that the Gloves would be available for inspection on February 1, 2021 was false when made, and Beyond Masks knew that 9 Kings would not be permitted to inspect the Gloves on February 1, 2021.

18.     Relying on the representations regarding the existence and availability of the Gloves, 9 Kings wired on or about January 28, 2021 the sum of $175,500 to Beyond Masks as an initial deposit for the Gloves.  On February 2, 2021, 9 Kings (through counsel) wired an additional $405,000 to Beyond Masks, for a total deposit of $580,500.

19.     Between about January 28 and January 31, 2021, Mr. May arranged for 9 Kings to receive a custom "proof of life" video purporting to prove the existence of the 430,000 boxes of Gloves and referring to 9 Kings as the intended recipient of the video and Gloves, as well as additional information purporting to show the Gloves' existence and Beyond Masks' possession of the Gloves.

20.     On information and belief, these representations were false when made, and Mr. May knew that they were false.  On information and belief, Beyond Masks did not have possession of the Gloves when these representations were made.

21.     Mr. Held remained in Los Angeles over the weekend to enable him to inspect the Gloves on February 1, 2021, the new date identified by Beyond Masks.  But when February 1 arrived, Beyond Masks did not allow 9 Kings to inspect the Gloves.  Rather, Beyond Masks

17382930.1

informed 9 Kings that the inspection of the Gloves would have to be further postponed, and that 9

Kings would not be able to inspect the Gloves on February 1, 2021.

22.     On or about February 2 or 3, 2021, 9 Kings and Beyond Masks memorialized their

discussions and course of dealing regarding the purchase and sale of the Gloves by executing the

SPA, which had an effective date of January 30, 2021.  Mr. Frederick executed the SPA on behalf

of Beyond Masks, and Mr. Matfus executed the SPA on behalf of 9 Kings.  Details regarding the

SPA are provided below.

23.     On or about February 2, 2021, 9 Kings sent Mr. Held to the Los Angeles warehouse

to inspect the Gloves.  But Beyond Masks did not provide Mr. Held with access to the warehouse;

instead, Beyond Masks had Mr. Held remain in Los Angeles for several more days waiting to

inspect the Gloves.

24.     On February 3, 2021, Beyond Masks indicated to 9 Kings that the Gloves

purportedly in the Los Angeles warehouse had failed an inspection that Beyond Masks had itself

undertaken, and therefore no inspection by 9 Kings would be permitted.

25.     Mr. Held remained in Los Angeles until February 10, 2021, when he left as it was

clear that no inspection of the Gloves would occur in Los Angeles.

26.     On February 10, 2021, Beyond Masks informed 9 Kings that it would replace the

non-conforming Gloves with replacements to be flown immediately into the United States from

Asia.  Mr. May arranged for 9 Kings to receive partially redacted shipping documents in an attempt

to assure 9 Kings that replacement Gloves were in fact en route from Asia to the United States.

27.     On information and belief, these representations were false when made, and

Beyond Masks and Mr. May knew that replacement Gloves were not en route from Asia to the

United States.

17382930.1

28.     Beyond Masks told 9 Kings that the replacement Gloves would arrive in New York City and would be available for inspection in the New York City area in the next several days.

29.     On information and belief, these representations were false when made, and there were in fact no replacement Gloves en route to the New York City area.

30.     On February 10, 2021, Beyond Masks communicated to 9 Kings that 200,000 boxes of Gloves were at Kennedy Airport—with an additional 400,000 boxes en route from Asia—and that the Gloves would be ready for 9 Kings' inspection and pickup by Friday, February 12, 2021 at the latest.

31.     After further delays, Beyond Masks told 9 Kings that the Gloves would be ready for inspection by 9 Kings at a warehouse in New Jersey on February 16, 2021.

32.     On information and belief, these representations were false when made, and Beyond Masks knew that no Gloves would be available for 9 Kings to either inspect or pick up in New York or New Jersey.

33.     On February 16, 2021, relying on Beyond Masks' representations about the existence and location of the Gloves, Mr. Matfus traveled to the warehouse designated by Beyond Masks in Elizabeth, New Jersey, to inspect the Gloves.  However, the warehouse was empty when Mr. Matfus arrived.

34.     Beyond Masks stated that the Gloves would arrive at the New Jersey warehouse later that day.  Mr. Matfus therefore waited at the New Jersey warehouse until the end of the business day, but no Gloves arrived.

35.     Beyond Masks never provided any Gloves for 9 Kings' inspection.

17382930.1

**9 Kings' Attempt To Resolve The Dispute Without Litigation**

36.     On February 17, 2021, Mr. Matfus emailed Mr. May a communication addressed to him and Mr. Frederick to demand an immediate refund in full from Beyond Masks of the $580,500 deposit made under the SPA, due to Beyond Masks' failures to fulfill its duties under the SPA—including its failure to produce any Gloves for inspection.

37.     Beyond Masks informed 9 Kings to expect the deposit to be returned by wire transfers starting on or about February 18, 2021.

38.     On February 18, 2021, Mr. Held queried Mr. May about the status of the return of 9 Kings' deposit, and Mr. May stated "This is happening buddy.  Sorry it's so done [sic] to the wire."

39.     On information and belief, this representation from Mr. May was false when made. Beyond Masks did not return any money to 9 Kings on February 18, 2021.

40.     On February 19, 2021, Mr. Frederick wrote to 9 Kings' representatives and counsel to state that "I am confident that we will be able to provide a refund on Monday [February 22] before close of business."

41.     On information and belief, this representation was false when made.  Mr. Frederick knew that Beyond Masks did not intend to provide any refund to 9 Kings.

42.     On Tuesday, February 23, 2021, 9 Kings sent Mr. Held personally to Beyond Masks' offices in Florida to demand repayment of the deposit.  Despite this and many other repeated demands from 9 Kings to Beyond Masks for the return of the entire $580,500 deposit paid for Gloves that Beyond Masks never provided, Beyond Masks has refused to return and failed to return any portion of the $580,500 deposit to 9 Kings.

17382930.1

43.     As described more fully below, the SPA requires Beyond Masks to return the full deposit to 9 Kings.  Beyond Masks has no legal or other right to retain the $580,500 deposit paid by 9 Kings.

44.     On February 26, 2021, counsel for 9 Kings sent a Notice of Default (attached as Exhibit C hereto) to Beyond Masks, once again demanding immediate repayment in full of the $580,500 deposit to 9 Kings.

45.     On March 5, 2021, counsel for Beyond Masks proposed a settlement arrangement with 9 Kings whereby Beyond Masks would pay $250,000 immediately upon execution of a written settlement agreement, to be followed by the remainder of the $580,500 deposit by monthly installments of $50,000 each, plus interest and the attorneys' fees of 9 Kings.  Through counsel, 9 Kings accepted this proposal in concept that same day, March 5, 2021.

46.     After acceptance in concept of Beyond Masks' settlement proposal, Beyond Masks ceased communication with 9 Kings until after 9 Kings once again demanded payment.  Following this demand, Beyond Masks put forward a revised settlement proposal, whereby Beyond Masks would make an initial payment of $210,000 followed by monthly payments of $50,000 each, plus interest and the attorneys' fees of 9 Kings.  Through counsel, 9 Kings also accepted in concept this revised proposal.

47.     On March 16, 2021, counsel for Beyond Masks sent a proposed settlement stipulation to counsel for 9 Kings for review.  The document proposed an initial payment by Beyond Masks of $250,000 followed by monthly payments to repay the remainder of the $580,500 deposit, plus interest and the attorneys' fees of 9 Kings.

17382930.1

48.     Counsel for 9 Kings reviewed this document and returned it to counsel for Beyond Masks on March 22, 2021, along with comments and drafts of a promissory note and personal guaranty, as contemplated by the proposed stipulation.

49.     On March 24, 2021, counsel for Beyond Masks contacted counsel for 9 Kings and stated that he would be speaking with Beyond Masks later that day, and would provide an update to counsel for 9 Kings following that discussion.  No further communication occurred until counsel for 9 Kings again pressed for a response on March 29, 2021.

50.     On March 30, 2021, counsel for Beyond Masks finally responded to counsel for 9 Kings.  Counsel for Beyond Masks stated that Beyond Masks refused to enter into the settlement agreement that Beyond Masks had itself proposed.  Counsel for Beyond Masks further stated that the comments provided by counsel for 9 Kings were reasonable and not problematic, and stated that Beyond Masks did not provide any reason for refusing to enter into the settlement agreement that Beyond Masks had itself proposed.

51.     On information and belief, the representations made by Beyond Masks concerning a repayment plan were false when made; Beyond Masks never intended to return the $580,500 deposit.

52.     On April 5, 2021 Mr. Held and Mr. Matfus traveled to Florida to meet with Mr. Frederick and once again demand that Beyond Masks sign the settlement stipulation and repay the $580,500 deposit.

53.     At the meeting at Beyond Masks' offices on April 5, 2021, Mr. Frederick stated that he did not have the cash to pay the initial payment under the settlement stipulation, and that he therefore could not sign the settlement stipulation.  Mr. Frederick stated that he needed more

17382930.1

time to pull together some money and that it might not be as much as was proposed in the settlement stipulation.

54.     On April 5, 2021, counsel to Beyond Masks sent a revised settlement stipulation to counsel for 9 Kings, proposing a settlement with an initial payment of $175,000, with the balance of the deposit, plus interest and 9 Kings' attorneys' fees, to be paid over 9 months rather than the previously contemplated 6 months, removing Mr. Frederick as a party to the settlement agreement, and deleting a provision reserving 9 Kings' rights against Beyond Masks, even though those provisions were included in the revisions previously approved by counsel to Beyond Masks.

55.     On April 7, 2021, counsel to 9 Kings indicated to counsel for Beyond Masks that 9 Kings would agree to the revised payment terms, but not to the other changes to the settlement stipulation that had previously been approved by counsel to Beyond Masks.

56.     At 1:38 p.m. on April 7, 2021, counsel to Beyond Masks asked counsel for 9 Kings to "stand by" before doing any further work on the settlement, indicated a refusal to reinstate the provisions that had been approved and later removed, and promised to respond to counsel for 9 Kings by the close of business the following day.

57.     On information and belief, the representations made by Beyond Masks concerning a revised repayment plan and settlement were false when made; Beyond Masks never intended to enter into or honor any settlement, or to return any part of the $580,500 deposit.

58.     This Complaint followed.

**Relevant Provisions Of The SPA**

59.     As discussed above, Beyond Masks and 9 Kings entered into the SPA effective January 30, 2021.

11

60.     The Recitals contained in the SPA formed a part of the agreement, and the parties "acknowledged" that the Recitals were "true and accurate."  SPA § 1.

61.     Beyond Masks expressly represented that it was "the owner and in possession of 430,000 boxes" of Gloves meeting the specifications of the SPA.  *Id.* at 1.  9 Kings relied on this representation when contracting to buy the Gloves.

62.     The total purchase price contemplated by the SPA for all 430,000 boxes of Gloves was $5,805,000 ($13.50 per box).  *Id.* § 3(a).  Within 5 business days of execution of the SPA, 9 Kings was obligated to pay Beyond Masks a 10% deposit ($580,500).  *Id.* §§ 4(a), 5(d).

63.     The quality of the Gloves was important to 9 Kings.  Therefore, the SPA included several provisions regarding this issue.  For example, "[u]pon receipt of the Deposit," Beyond Masks was required to "provide Buyer, Buyer's clients and their representatives and inspectors, with access to the" Gloves for purposes of an inspection.  *Id.* §§ 4(a), 6.  Beyond Masks was also required to provide a custom "proof [o]f life video" and other information regarding the existence and authenticity of the Gloves within no more than 48 hours of receiving the deposit from 9 Kings.  *Id.* § 5(e).

64.     Section 6 of the SPA provided a detailed process for 9 Kings' inspection of the Gloves.  These provisions include:

   a.   Within 48 hours of 9 Kings' payment of the deposit, Beyond Masks was required to permit an inspection of the Gloves, by giving 9 Kings' inspector "full access to the goods and to all paperwork associated with the goods."  *Id.* § 6(a); *see also id.* § 5(f).

   b.   The SPA expressly acknowledged that "Buyer's intention to purchase the Goods is conditioned upon a satisfactory inspection of the Goods and relevant

12

documentation . . . .   The principal purpose of the Inspection is to verify the condition of the Goods and the conformity of the Goods to the specifications" in the SPA.  *Id.* § 6(c).

65.     The SPA also specified the result if 9 Kings was dissatisfied with its inspection of the Gloves:  if it was "not satisfied with [its] inspection of the Goods, or is otherwise not satisfied with Seller's evidence of good title to the Goods, then Buyer may cancel the Transaction . . . by written notice to the Seller . . . specifying the reason for such cancellation with reasonable detail, and requesting the return of the Deposit and any other funds previously paid to Seller on account of the purchase of the Goods."  *Id.* § 6(d).  "If Seller does not dispute the finding of nonconformity or other defect in the goods or title thereto, then Seller shall promptly (and in any event within 5 business days) return the Deposit . . . ."  *Id.*

66.     The SPA also contained an express warranty regarding the Gloves on Beyond Masks' part:

> In the event that any Goods delivered hereunder are defective or do not conform to the requirements of this Agreement, Seller shall reimburse Buyer for the full Purchase Price paid by Buyer for such defective or non-conforming Goods within fifteen (15) days after written notice is given to Seller of such defect or non-conformity. Seller hereby warrants to Buyer that all Goods hereunder shall be new and unused, of first quality, free from defects, merchantable and suitable for their intended purpose, conforming to provided samples in all respects, and in all respects (including packaging) in conformity with all specifications . . . .   Buyer and its clients shall also have the benefit of all manufacturers warranties on the Goods.

*Id.* § 8(a).

67.     All conditions precedent to this suit have occurred, have been performed, or have been waived.  9 Kings has satisfied its obligations under the SPA; Beyond Masks has not.

17382930.1

## CLAIMS FOR RELIEF

### COUNT ONE
**(Breach Of Contract Under New York UCC And Common Law—Against Beyond Masks)**

68.     9 Kings hereby realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     Beyond Masks is a merchant engaged in the sale of goods within the meaning of New York UCC §§ 2-104 and 105.

70.     On or about February 2 or 3, 2021 (effective January 30, 2021), 9 Kings and Beyond Masks entered into the SPA, a contract, pursuant to which Beyond Masks would sell and 9 Kings would buy the Gloves.

71.     9 Kings has performed all of its obligations under the SPA.

72.     Subsequent to entering into the SPA, as described in detail above, Beyond Masks wrongfully and in breach of the SPA, among other things:

    a.  Did not own and possess the Gloves;

    b.  Did not permit 9 Kings to inspect the Gloves;

    c.  Did not provide any Gloves to 9 Kings; and

    d.  Did not return the deposit paid by 9 Kings to Beyond Masks.

73.     As a result of the foregoing, 9 Kings has been damaged in an amount to be determined at trial, but not less than $580,500 plus interest.

### COUNT TWO
**(Unjust Enrichment Under New York Common Law—Against Beyond Masks)**

74.     9 Kings hereby realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

17382930.1

75.     As described in detail above, 9 Kings paid $580,500 to Beyond Masks as a deposit for Gloves that Beyond Masks never provided to 9 Kings, and Beyond Masks never returned the deposit to 9 Kings.

76.     By virtue of Beyond Masks' actions, as described in detail above, Beyond Masks has been unjustly enriched at 9 Kings' expense.

77.     Considerations of justice, equity, and good conscience require that Beyond Masks make restitution to 9 Kings.

78.     Therefore, at minimum, Beyond Masks should be required to return the full amount of the deposit, plus interest, to 9 Kings.

## COUNT THREE
### (Conversion Under New York Common Law—Against Beyond Masks)

79.     9 Kings hereby realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.     As described in detail above, 9 Kings paid $580,500 to Beyond Masks in specific wire transactions as a deposit for Gloves that it contracted to purchase from Beyond Masks.

81.     Beyond Masks never provided Gloves to 9 Kings, nor did it allow 9 Kings to inspect the Gloves as the SPA required.

82.     9 Kings demanded the return of its deposit from Beyond Masks (in accordance with the SPA) on multiple occasions both in writing and by other means.

83.     Beyond Masks has no legal or other right to retain any of the deposit paid by 9 Kings.

84.     The SPA requires Beyond Masks to return the full $580,500 deposit to 9 Kings.

85.     But Beyond Masks has wrongfully retained and refused to return the $580,500 deposit to 9 Kings.

17382930.1

86.     As a result of the foregoing, 9 Kings has been damaged in an amount to be determined at trial, but not less than $580,500 plus interest.

## COUNT FOUR
**(Fraud Under New York UCC And Common Law—Against All Defendants)**

87.     9 Kings hereby realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     As described above, Beyond Masks, Mr. Frederick, and Mr. May made false representations of material fact that were intended to induce 9 Kings to rely on them to contract for the purchase of the Gloves from Beyond Masks.  These misrepresentations include, but are not limited to: that Beyond Masks had possession of Gloves meeting the desired specifications; that the Gloves were available for inspection by 9 Kings (whether near Los Angeles or near New York City or in a warehouse in New Jersey); that to-specification replacement Gloves were arriving from Asia; and that Beyond Masks would return the full $580,500 deposit to 9 Kings.

89.     As described above, when Beyond Masks, Mr. Frederick, and Mr. May made these representations, they knew them to be false.

90.     Based on Beyond Masks' status as a business specializing in sourcing and distributing personal protective equipment (including medical-grade nitrile gloves), 9 Kings was justified in relying on these representations in contracting to purchase the Gloves from Beyond Masks.  In fact, Beyond Masks states that it has "a team of highly experienced, top-notch partners to fortify sourcing, international production and connecting products with end users" to provide "a solution to the desperate cry" for personal protective equipment in the wake of the COVID-19 pandemic.

91.     As described above, 9 Kings relied on the representations made by Beyond Masks, Mr. Frederick, and Mr. May to the detriment of 9 Kings.  Among other things, 9 Kings paid

17382930.1

$580,500 to Beyond Masks as a deposit for Gloves that Beyond Masks never provided to 9 Kings, and Beyond Masks never returned the deposit to 9 Kings.

92.     As a result of the foregoing, 9 Kings has been damaged in an amount to be determined at trial, but not less than $580,500 plus interest.

93.     Defendants' repeated and continuous fraud throughout their dealings with 9 Kings justifies an award of punitive damages to 9 Kings.

## PRAYER FOR RELIEF

WHEREFORE, 9 Kings requests the Court enter judgment in its favor on all counts and prays for the following relief:

A.      An award of damages in an amount to be determined at trial, but not less than $580,500.

B.      An award of punitive damages in an amount to be determined at trial.

C.      An award of 9 Kings' attorneys' fees, expenses, and costs.

D.      An award of pre-judgment and post-judgment interest.

E.      Any other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

9 Kings hereby demands a trial by jury on all issues so triable.

[REMAINDER OF THIS PAGE INTENTIONALLY BLANK]

17382930.1

Dated: April 12, 2021

<div style="margin-left:40%">

**MICHELMAN & ROBINSON, LLP**

By:     */s/ Brooke Haley*
        Brooke Haley
        800 Third Avenue, 24th Floor
        New York, NY 10022
        (212) 730-7700
        bhaley@mrllp.com

**PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**

Timothy J. Bryant
(*pro hac vice* application forthcoming)
Martin C. Topol
(*pro hac vice* application forthcoming)
One City Center, P.O. Box 9546
Portland, ME 04112
(207) 791-3000
tbryant@preti.com
mtopol@preti.com

*Counsel for Plaintiff*
*9 Kings Hong Kong Limited*

</div>

17382930.1